HOLLIS COTTON OIL, LIGHT & ICE CO. v. MARRS & LAKE.  (No. 8913.)

(Court of Civil Appeals of Texas. Ft. Worth. Nov. 9, 1918.    Rehearing Denied Dec. 14, 1918.)

1. APPEAL AND ERROR ⬨⟩930(1)—QUESTIONS OF FACT—SUFFICIENCY OF EVIDENCE.

In reviewing an assignment that the evidence was not sufficient to sustain a finding of fact, strongest probative effect must be given to the evidence tending to establish such fact.

2. BROKERS ⬨⟩8(3) — EMPLOYMENT — SUFFICIENCY OF EVIDENCE.

In a cross-action, wherein commissions, damages, etc., were sought by defendant broker for breach of a contract to receive cattle purchased by plaintiff, evidence *held* sufficient to sustain a finding that such cattle were purchased upon plaintiff's order.

3. BROKERS ⬨⟩8(3)—EMPLOYMENT—EVIDENCE.

In an action wherein commissions, damages, etc., were sought for breach of a contract to receive cattle, evidence *held* sufficient to sustain a finding that the person ordering the cattle was acting within authority given him.

4. EVIDENCE ⬨⟩80(1) — LAWS OF OTHER STATES—PRESUMPTIONS.

Where statutes and law of another state with reference to the subject of ultra vires acts of a corporation were neither pleaded nor proven, the law of such other state will be assumed to be the same as that of the forum.

5. CORPORATIONS ⬨⟩385—ULTRA VIRES ACTS —DEFENSE.

Except in cases where the rights of the public are involved, the plea of ultra vires, whether interposed for or against a corporation, will not be allowed to prevail when it will not advance justice, but will accomplish a legal wrong.

6. CORPORATIONS ⬨⟩382—ULTRA VIRES ACTS —STATUTE—COMMON LAW.

Vernon's Sayles' Ann. Civ. St. 1914, art. 1164, as amended by Acts 35th Leg. c. 15 (Vernon's Ann. Civ. St. Supp. 1918, art. 1164), is merely declaratory of common law, by which corporations are strictly confined in their pow-

ers to the limits and purposes for which created.

**7. CORPORATIONS ⬡374—CHARTER POWERS—IMPLIED POWER.**

In every express grant in a corporate charter, there is implied a power to do what is necessary or reasonably appropriate to the exercise of the authority expressly granted.

**8. CORPORATIONS ⬡434—POWERS—PURCHASE OF PROPERTY.**

A corporation, granted power to operate and maintain cotton seed oil mills, etc., and to sell "cotton seed and any and all products and by-products," had the power to purchase cattle to be fed on hulls at a time when there was practically no market for the hulls.

**9. CORPORATIONS ⬡388(1)—ULTRA VIRES ACT—ESTOPPEL.**

Where a corporation ordered cattle, and the cattle were actually shipped, corporation was estopped to set up as a defense that it had no power to purchase cattle, in an action for damages and commissions, although shipper again took possession and found another purchaser at the best possible market price.

**10. CORPORATIONS ⬡385—ULTRA VIRES ACTS.**

Mere general prohibitions against exceeding corporate powers do not make such acts illegal as well as ultra vires.

**11. NEW TRIAL ⬡104(3)—NEWLY DISCOVERED EVIDENCE—DISCRETION OF COURT.**

In an action involving question whether a contract had been made over telephone, there being a conflict as to whether there was one or two conversations, court did not abuse its discretion in denying motion for new trial on ground of newly discovered evidence, consisting of affidavit of telephone company employé that files showed two conversations had been had between the parties.

**12. BROKERS ⬡82(4)—ACTION FOR COMMISSIONS AND EXPENSES—VARIANCE.**

In an action wherein commissions and damages for refusal to receive cattle were sought, where it was pleaded that the cattle were purchased as agent, proof that the sale was consummated through a commission company as shipper, and that the cattle were sold at the cost price, plus $10 a car commission and expenses, was not a material variance; measure of damages being the same.

Appeal from District Court, Tarrant County; Bruce Young, Judge.

Action by the Hollis Cotton Oil, Light & Ice Company against Marrs & Lake. Judgment for defendant on a cross-action, and plaintiff appeals. Affirmed.

Bryan, Stone & Wade, of Ft. Worth, and Bond, Melton & Melton, of Chickasha, for appellant.

James C. Wilson, Slay, Simon & Smith, and B. K. Goree, all of Ft. Worth, for appellee.

BUCK, J. This is an appeal from an adverse judgment against the appellant as plaintiff in a suit in which it sought to recover for certain feed furnished and freight charges paid on a shipment of cattle from Ft. Worth, Tex., to Hollis, Okl., and a judgment in favor of defendants, Marrs & Lake, on their cross-action for damages for alleged breach of contract.

Plaintiff alleged that on October 12, 1915, defendants delivered to the railroad company at Ft. Worth ten carloads of bulls for shipment to appellant, Hollis, representing to the railroad company that the freight charges would be paid at the destination. It was further alleged that plaintiff had not purchased the bulls from defendants, and knew nothing about such shipment until after it was made; that when the cattle arrived at Hollis, the manager of plaintiff was out of the city, and an employé, without authority in the premises, but supposing from the fact of said shipment that plaintiff had purchased the cattle, paid the freight thereon and unloaded the cattle; that on the next day the manager of the plaintiff returned from Kansas City, and being advised of the situation, immediately notified defendants that the cattle were held subject to their order; that on October 20th, defendants went to Hollis and took possession of and moved the cattle; but in the meantime plaintiff had been compelled to and had fed to the cattle cotton seed meal and hulls of the market value of $212.70, for the recovery of which, together with freight, also paid, in the sum of $320, this suit is filed.

Defendants answered: That on and prior to the date of shipment of said cattle they were engaged at Ft. Worth in the general live stock commission business, purchasing cattle for themselves and also for their customers; with reference to the undisputed purchase by the plaintiff of the cattle involved in this suit, defendants alleged, "that for some time prior to November 11, 1915," and at the special instance and request of the Hollis Cotton Oil, Light & Ice Co., and of its agents and officers, particularly the said J. A. Stine and E. C. Burton, the defendants had been purchasing for the account of said plaintiff company and shipping to it live stock, charging said plaintiff company for their services a commission on said transactions and billing out the stock so purchased to said concern at Hollis, Okl., and against which shipments they would draw drafts for the purchase price of said cattle, said concern paying the same and the freight and other charges on said purchases. That in the latter part of September, 1915, said plaintiff and its officers and agents directed the defendants to advise or give them notice when some 200 to 400 bulls and some medium grade steers could be purchased at Ft. Worth. That on receipt of said request and directions, the defendants

advised plaintiff and its officers and agents of their ability to purchase several carloads of such cattle, and that, upon being so advised of the character of the cattle that could be purchased, and of the price thereof, plaintiff and its officers and agents directed the defendants to purchase said cattle, which was done and for the account of said plaintiff; that on the purchase of said cattle upon the terms and conditions authorized, plaintiff and its agents directed the defendants to ship out and bill said cattle to plaintiff at Hollis, Okl., with freight and other charges to follow and to be paid by plaintiff, and to draw draft against plaintiff for the purchase price of said cattle.

It was further alleged that the shipment was made according to order, and 10 carloads of cattle or bulls, being 281 head, were shipped to the plaintiff at Hollis, and that a draft in the sum of $12,382.17 was drawn on plaintiff to cover the cost of said cattle, including $10 per car commission to the defendants, $37.70 for feed given said cattle by defendants, and $13.50 for clipping the horns of said cattle. It was further alleged that plaintiff thereafter failed and refused to keep said cattle or to pay for same. It was further alleged that thereupon defendants were forced and required to take possession of said cattle, and thereafter to sell the same at a depreciated price. Various items of damages were pleaded, for cattle that died in the shipment, during the time they were in plaintiff's feeding pens at Hollis, and while removing them to pasture in Texas, railroad fare and expenses of employés in handling said cattle, pasturage, etc., alleged to be in the amount of $4,500. Judgment was sought against plaintiff and J. H. Stine and E. C. Burton in said sum. In its supplemental petition, while denying that any contract with the defendants relative to the purchase of the cattle by plaintiff had been made, plaintiff further pleaded that if it had made, or attempted to make, the contract or agreement alleged in defendants' cross-petition, such contract was ultra vires and not binding upon plaintiff and wholly void.

Defendants in supplemental answer denied that the contract alleged was ultra vires of plaintiff's charter powers, but alleged that such contract and acts were customary, usual, and incidental and necessary to the exercise by plaintiff of its charter rights.

The cause was submitted to a jury on special issues, and the jury found in answer to the same:

(1) That J. H. Stine authorized and directed the defendants to purchase for the account of plaintiff and to ship to it the cattle in question; (2) that J. H. Stine agreed to pay defendants the amount which defendants had paid for the cattle with the additional charge of $10 per car in the way of commissions; (3) that J. H. Stine was authorized

207 S.W.—24

by plaintiff or directed by it to purchase for its account said cattle; (4) that defendants believed that said Stine was so authorized by plaintiff to purchase the cattle in controversy from defendants and for plaintiff; (5) that the transactions theretofore had between plaintiff and the defendants, and negotiations between them, have been of such a nature and character as to cause a man of ordinary care and prudence to believe that said Stine was authorized by plaintiff to purchase the cattle for it.

Each party filed a motion for judgment; the defendants' motion being granted. Judgment was entered, denying plaintiff's right to recover, and giving judgment in favor of defendants against the plaintiff in the sum of $2,043.35, with interest from June 29, 1917. From this judgment the plaintiff has appealed.

[1] The sufficiency of the evidence to establish the contract alleged by defendants between them and plaintiff is challenged by appellant in several assignments. To determine whether or not the contention thus made is sustainable, the strongest probative effect must be given to the evidence tending to establish the existence of the contract.

E. C. Burton testified that he lived at Chickasha, Okl., and in October, 1915, was president and general manager of plaintiff company, while Robert Freeman was the local manager; that on or before October 9th he left Chickasha for Kansas City, and on his return the draft drawn to cover the purchase price of these cattle and the expenses was presented to him; that he had not purchased or authorized the purchase of the cattle, and had no information of any kind with reference thereto; that immediately he called up Mr. Freeman, the local manager at Hollis, to know if the cattle had arrived, and that the latter told him that they had been unloaded and the freight paid; that he instructed Mr. Freeman to feed the cattle, but not to deliver them to any one until the freight and feed bill had been paid; that he then talked over the telephone with Mr. Lake at Ft. Worth; that the latter admitted to him that while he had talked with Stine about shipping the cattle, yet Stine had not instructed him to ship them, but that he, Lake, felt sure that plaintiff was in the market for that character of cattle, and thereupon proceeded to ship them. Some discussion between Burton and Lake was had looking to an acceptance of the cattle by the former upon a reduction in the price, but no agreement was reached.

The evidence shows that the feeding pens at Hollis were built by the plaintiff company in 1912–1913 to accommodate cattle which the company was feeding; that on several occasions cattle were purchased by the plaintiff, and were fed in these pens and with the hulls, cotton seed meal, etc., from the mill,

and fattened for the market; that in some instances the cattle were purchased through Stine for the plaintiff company, and in other instances the cattle were owned by Burton and Stine, and some by Stine alone; also that the pens were rented to other feeders, who used the plaintiff company's products for fattening their cattle.

The evidence further shows that at the time these cattle were shipped, or shortly prior thereto, plaintiff company had on hand a large quantity of meal and hulls from the 1914 season; that the market for such products at this time was very low; that the plaintiff needed the storage room in its mill and bins for the 1915 crop; that it had not been able to sell the stock on hand at a desirable price; that on the trip of Burton, plaintiff's manager, to Kansas City some of the stock on hand had been sold, just how much is not disclosed. On September 27, 1915, said Burton, acting for plaintiff company, wrote to Lake as follows:

"Mr. Will F. Lake, Care Cassidy-Southwestern Commission Co., North Ft. Worth, Texas—Dear Sir: Referring to your letter to Mr. Stine, we would like to buy 200 to 400 bulls and when you have or know of some that are going to be in Ft. Worth, please wire us in advance and we will get Mr. Stine to go down and look at them. Or at any time there are two or three or four carloads which can be bought right, please call Mr. Stine and if you cannot get him, call us over phone. We might also be interested in buying some medium grade steers about which you may call either Mr. Stine or ourselves, but in all cases call Mr. Stine first and if you cannot get hold of him, then call us."

The evidence further shows that J. H. Stine was a stockman, well acquainted with the cattle business, and at the instance of Mr. Burton had several times acted for him in passing upon the character and price of cattle bought for the plaintiff company. Shortly prior to the letter of September 27, 1915, the defendants had received from Stine a letter to the effect that the Hollis company wanted some cheap Mexican bulls or steers to put on feed. In reply to Stine's letter, Lake wrote and told him that whenever he could get hold of some Mexican bulls he would write him and let him know. About October 5th thereafter the defendants bought a carload of bulls at Ft. Worth, and, failing to get telephone connection with Stine, talked to Burton, who told them to ship them. In this instance draft was drawn through the bank at Chickasha and paid. There were some 24 head of bulls in this shipment. No one came down to inspect the shipment, but plaintiff apparently relied upon the representations made by Lake as to the character of cattle shipped. On October 9th defendants bought 3 carloads of cattle, and called up Stine over the telephone and told him what they had. Stine instructed de-

fendants to ship the cattle to the plaintiff company, which was done, and draft was drawn and paid as in case of the first shipment. In both cases the draft included $10 a car in the way of commissions to the defendants. Stine did not see the cattle in the second shipment before they were received at Hollis, and defendants had no conversation with Burton about the shipment.

On October 5th, Burton acting for plaintiff, wrote Lake as follows:

"Mr. Will F. Lake, Care Cassidy-Southwestern Commission Co., North Ft. Worth, Texas—Dear Sir: Your appreciated favor of the 4th received giving account of 23 bulls purchased and shipped to the Hollis Cotton Oil Company, Hollis, and note same only weighed 21,530 lbs. Sorry you did not get one or two more bulls and put in this car for the reason the carload rate on stock cattle is $33.00 for standard 36-foot cars. The rate is based on minimum weight of 22,000 lbs. at a 15 cent rate. However, you could ship 24,000 or 25,000 lbs. and would not have to pay but $33.00 for the standard 36-foot car. In future please see that you get 23,000 to 25,000 lbs. in the car and simply write on the bill of lading the number of head of cattle and put weight of 22,000 lbs. in your bill of lading.

"Note the other carload you mentioned over phone to Mr. Stine yesterday was sold to some one else, but eight out of the carload only brought 4½ cents and the others 5 cents. In other words, the carload did not average but very little over 4¾ cents.

"Yours very truly,          E. C. Burton."

The evidence shows that it was customary to feed cattle like those shipped to plaintiff by defendants from 90 to 140 days, and that such cattle ate from 30 to 40 pounds of hulls each per day; that at the time of shipment in question, the plaintiff company had on hand enough hulls to feed and fatten 250 head of hulls; that it had been the intention and practice of plaintiff's manager, Burton, to sell its hulls rather than to feed them to cattle, when they could get a profit thereon; that when there was not a market for the hulls and the storage capacity of plaintiff's mill was fully exhausted, cattle were bought and fed. The evidence further shows that Burton himself was not an experienced stockman, and used and relied on the judgment of Stine in the purchase of cattle for feeding purposes.

Lake testified with reference to the shipment in question that he bought the cattle on October 11th, "with the idea of the Hollis Company"; that he tried to call up Stine on said date, but failed to get him, and also called for Mr. Burton, but failed to get him; that on the next day he did get into communication with Mr. Stine, and told him that he had 7 carloads of Mexican bulls and 2 loads of native bulls, and gave him the price, and that there were 2 other loads of white-faced bulls held by Cassidy-Southwestern Commission Company. Mr. Stine replied that Mr. Burton was in Kansas City, but

that it was all right to let the cattle come. Lake then told him that the Mexican bulls were not "tipped," and Stine instructed him to have their horns tipped, which was done at a cost of $13.50, which was a reasonable and proper charge for that work; that after the conversation with Stine, Lake learned that the Cassidy-Southwestern Commission Company had sold their bulls, and he purchased another carload of bulls and sent them along, making 281 head in all; that at the time he shipped these cattle he believed, in view of prior dealings and instructions with and from Burton, as manager of plaintiff company, that Stine had authority to accept the shipment for plaintiff. Lake further testified that in his conversation with Burton on October 14th, Burton stated that he had not bought any bulls, and that he had sold his feed and did not want any bulls, and had not authorized Stine to buy any for him. At this time the shipment had already been received at Hollis. Lake further testified that he sold the cattle to the plaintiff at the price at which they had been purchased by him, plus the commission of $10 a car and the expenses incurred.

Marrs testified: That after he learned from Lake that Burton had refused to pay the draft and to accept the shipment, he talked with Stine over the phone. That Stine said: "I am very sorry that this has occurred. I feel that I am responsible for it." That Stine further admitted that there was no complaint about the cattle, but that the truth of the matter was that the controversy had arisen because of the advance in the price of feed. "Feed has jumped away up, and he (Burton) has sold it, and that is the reason the thing is balled up. That is the trouble about your cattle, is the feed advancing; he has sold it and he don't want to take the cattle." Marrs testified when Stine was asked if he had instructed Lake to ship the bulls, he answered that he had, and, when asked if he had instructed Lake to buy them, he said he had told him to do so if they could be bought right, and also had instructed Lake to have the horns of the bulls tipped.

[2, 3] From the evidence quoted, and other testimony of like import, we are of the opinion that the evidence is sufficient to sustain the findings of the jury that in fact Stine did order the bulls to be shipped to plaintiff company, and that in so doing he was acting within the authority given him by Burton as manager of the company, and that Lake shipped the cattle, relying on instructions and authority given him.

The next question presented is as to whether or not the plea of ultra vires urged by plaintiff should have been sustained. The charter of the Hollis Company provides, among other things:

"That the purposes for which this corporation is formed are to erect, maintain, purchase, or otherwise acquire, operate and maintain cotton seed oilmills and ginneries and in connection therewith to produce cotton seed oil; to buy, sell, gin, bale, and prepare seed cotton * * * to manufacture, produce, prepare, buy, sell, import, export and generally deal in cotton seed and any and all products and by-products thereof * * * and to do such other things as will further the interests of the cotton oil, ginnery, ice, electric light, and elevator business."

[4] Much has been written and many decisions have been rendered on the subject of what constitutes ultra vires acts on the part of a corporation, and when such plea is sustainable and when not, and the authorities are not entirely in harmony in their application of the enunciated principles to particular facts disclosed in the cases. The statutes and law of Oklahoma with reference to the subject of ultra vires were neither pleaded nor proven; consequently, in determining whether the contract alleged by defendants was ultra vires on the part of plaintiff, we will assume that the law of Oklahoma is the same as it is in this state.

[5] As stated in 10 Cyc. 1156:

"Except in cases where the rights of the public are involved the plea of ultra vires, whether interposed for or against a corporation, will not be allowed to prevail when it will not advance justice, but will accomplish a legal wrong. The courts reach a just result, in cases where the question is not one of public policy, and where there has been no violation of law, and in many cases where there has been, by holding that the corporation itself on the one hand, and the party contracting with it on the other hand, are estopped by their own contract or conduct from setting up, as a defense to an action to enforce the contract, that it was beyond the power of the corporation to make it; and it is a general principle of law that no party will be permitted to set up this defense while retaining the fruits or the benefits of the contract."

[6] Article 1164 of Vernon's Sayles' Texas Civil Statutes, as amended by Acts 35th Leg. c. 15 (Vernon's Ann. Civ. St. Supp. 1918, art. 1164), provides in part, that:

"No corporation, domestic or foreign, doing business in this state shall employ or use its stock, means, assets, or other property, directly or indirectly for any other purpose whatever than to accomplish the legitimate objects of its creation, or those * * * permitted by law."

As held by our Supreme Court in a number of cases, this provision of the statute is merely declaratory of the common law, by which corporations are strictly confined in their powers to the limits and purposes for which created.

[7, 8] With reference to the charter powers of a corporation, it may be said that in every express grant there is implied a power to do whatever is necessary or reasonably appropriate to the exercise of the authority expressly granted. Whatever may be a com-

pany's legitimate business, the company may foster it by all the usual means; but it may not go beyond this. If the means be such as are usually resorted to, and a direct method of accomplishing the purpose of the incorporation, they are within its powers; if they be unusual, and tend only in an indirect manner to promote its interest, they are to be held ultra vires. Northside Ry. Co. et al. v. Worthington, 88 Tex. 562, 30 S. W. 1055, 53 Am. St. Rep. 778. For instance, a railway company may establish and maintain refreshment houses along its line for the accommodation of its passengers. Flanagan v. Railway Co., L. R. 7 Eq. 116. Such establishments are not unusual, and are strictly subordinate to the main purposes for which such companies are created and tend to increase their traffic.

In Ft. Worth City Co. v. Smith Bridge Co., 151 U. S. 294, 14 Sup. Ct. 339, 38 L. Ed. 167, the United States Supreme Court, through Chief Justice Fuller, held that the contract of the City Company to contribute to the construction of a bridge across the river which separated its lands from the city of Ft. Worth was not ultra vires. The court said:

"The object of the creation of the corporation was the acquisition and sale of lands on subdivision and it cannot successfully be denied that that object would be directly promoted by the use of legitimate business methods to render the lands accessible. This involved the expenditure of money or the assumption of liability, but there is no element in this case of any unreasonable excess in that regard, or of the pursuit of any abnormal and extraordinary method."

In Munoz v. Brassel, 108 S. W. 417, by the Court of Civil Appeals for the Fourth District, writ denied, it was held that a corporation whose charter provided that its principal business "shall be buying and selling liquors, etc., at wholesale and retail," had implied power to sign a saloon keeper's bond as surety, though no express or implied contract existed between them that he would purchase liquors of the corporation, since becoming surety for a possible customer is a proper and usual means of promoting its business.

In Bowman Lumber Co. v. Pierson, 139 S. W. 618, this court held that a corporation chartered for the purpose of buying and selling lumber and other building materials had no power to bind itself as guarantor for the performance by a contractor of a building contract, and that such attempted contract was ultra vires.

In First National Bank of Aspermont v. Conner et al., 106 Tex. 549, 172 S. W. 1106, the Supreme Court granted a writ of mandamus to require the judges of this court to certify the question involved in the Bowman Lumber Company Case, supra, to wit, whether a corporation chartered for the purposes mentioned was liable on its undertaking as a surety upon a building contractor's bond. The ground upon which relator, the bank, sought the writ of mandamus was that there existed a conflict between the holding by this court in the Bowman Lumber Company Case and the holding by the Court of the Fourth District upon the same question, in Munoz v. Brassel. The Supreme Court granted the writ, and the question involved was certified to the Supreme Court, but it has not yet been answered to our knowledge. However, by the action of the Supreme Court in granting the writ of mandamus to certify in the Bowman Lumber Company Case, and in denying a writ of error in the Munoz v. Brassel Case, we are perhaps not justified in following the Bowman Lumber Case as authority.

In Railway Co. v. Robards, 60 Tex. 545, 48 Am. Rep. 268, the Supreme Court held that the contract made by a railroad company for the building of a hotel by another at its depot, and whereby the railroad company promised to convey to the other party certain lots and to perform certain other acts, in consideration of said party's building the hotel, was not a contract ultra vires of the railroad company. In the instant case one of the declared purposes of the incorporation of the Hollis Company was to sell "cotton seed and any and all products and by-products thereof." The evidence shows that at the time the alleged contract was made between Marrs & Lake and Stine, acting for the Hollis Company, there was practically no market for its hulls it had on hand, that its storage capacity was filled to its utmost, and that the mill was desirous of disposing of its hulls on hand in order to make room for the demands of the coming season. The purchase of cattle to be fed on said hulls was, it seems to us, under the Munoz v. Brassel Case, and other authorities, a reasonable and practical method of using said hulls in a profitable way, and cannot be said to be an unusual and abnormal means to accomplish one of the main and legitimate purposes announced in its charter, to wit, to sell the hulls and other by-products of cotton seed. Certainly this plan was no less a direct method of accomplishing its announced charter purpose than was the method sustained in the Munoz v. Brassel Case.

In Comanche Oil Co. v. Browne, 99 Tex. 660, 92 S. W. 450, it was held that an oil company, whose announced purpose in its charter was "to erect and own a cotton seed mill," did not exceed its charter powers in operating one or more cotton gins reasonably necessary and proper as feeders for said oil mill, and that the further announced purpose in its charter, "to erect, own, and operate whatever cotton gins may be necessary and proper as feeders for said oil mill," conferred upon the corporation no further power than would have been implied had the last charter provision quoted been omitted.

In City of Indianola v. G., W. T. & P. Ry. Co., 56 Tex. 594, it was held that a contract by the railroad company with the city of Indianola under the terms of which the railroad company, in order to secure a right of way over the city's streets, agreed to extend the road a certain distance beyond the town, and executed a bond to insure the performance thereof, was not an ultra vires contract. The court held that the railroad company undoubtedly, under its charter, had the authority to purchase the right of way, and that its agreement to extend the road beyond the town's limits was but a means and method of securing a franchise over the streets. The testimony in this case sustains the theory of appellees that in the purchase of the cattle in question, it was not the purpose of the oil company to embark in the cattle business as a separate and independent venture, but that the purchase was made to accomplish an advantageous use and disposal of the heavy stock of feed on hand, for which, at the time, there was no favorable market.

Appellant cites Mitchell v. Hydraulic Bldg. Stone Co. et al., 61 Tex. Civ. App. 131, 129 S. W. 148, by the Texarkana Court of Civil Appeals, and Zurn v. Mitchell, 196 S. W. 544, by this court, as sustaining its contention that the contract in question was ultra vires. In the first case Mitchell sued on a contract executed by the Hydraulic Building Stone Company, a corporation, under which the said company agreed to "well and sufficiently perform and finish" for Mitchell, under the direction and to the satisfaction of its architects, "all the work included in the excavating, grading, cement floors, brickwork, concrete blocks, and footings * * * of the two-story and basement residence" to be constructed by said Mitchell. The corporation's charter provided that:

"The purpose of this corporation shall be to manufacture and deal in building material and to purchase and sell such material as is necessary in the transaction of its business."

The Texarkana Court of Appeals decided that the contract sued upon was ultra vires, and therefore not enforceable. It was further found that the record failed to disclose that in entering into the contract the Building Stone Company's purpose was to promote the sale of material to go into the building. While in the course of the opinion the court discussed the question as to whether, even though such was the purpose of the Building Stone Company, and that it could not have effected a sale of its materials in any other way, such contract would be ultra vires, and decided that such facts and purposes would not remove the contract from the inhibited class; however, the discussion of these assumed or imaginary facts and conditions was not essential to the disposition of the appeal, and therefore the remarks of the court with reference thereto may be considered obiter dicta. But in any event, while a

corporation organized for the manufacture or handling of certain commodities may not enter into a building or construction contract, involving the expenditure of large sums of money for labor and material other than that manufactured by the corporation, merely because the construction undertaken by the corporation may afford the opportunity to use the material manufactured or handled by the corporation (Wire Co. v. Baltimore, 74 Fed. 372, 20 C. C. A. 462; Ramsey v. Tod, 95 Tex. 614, 69 S. W. 133, 93 Am. St. Rep. 875) yet, as shown in Comanche Cotton Oil Co. v. Browne, and Railway Co. v. Robards, supra, if the contract is reasonably incident to and for the direct purpose of furthering and promoting the corporation's legitimate and authorized business, the contract is not ultra vires merely because it goes outside the specific charter powers. In other words, if the undertaking of the corporation is incidental to the company's chartered purposes and reasonably necessary to enable it to accomplish such purposes, such undertaking is not in excess of its corporate powers.

In Zurn v. Mitchell, supra, we were presented with a case in which the unlawful character of the contract was res adjudicata. Appellees admitted that the contract was ultra vires and void as to the corporation, but sought to hold the sureties on the Building Stone Company's bond. The Texarkana court having held that the contract between Mitchell and the Hydraulic Building Stone Company contemplated an undertaking which could not be regarded as incidental to the exercise of power expressly conferred upon the company, and no question of estoppel being in the case, it became the law in that case that the contract was illegal. In Zurn v. Mitchell, supra, this court merely decided that where the evidence showed that the contract sued upon was illegal and prohibited by the statute, and that therefore said contract was unenforceable as against the principal, it was also unenforceable as against the sureties. Moreover, a writ of error was granted in this case by the committee of judges assisting the Supreme Court.

[9, 10] But, even if we are mistaken in the views heretofore expressed, we are of the opinion that this judgment should be sustained on the ground that the plaintiff corporation was estopped from asserting its lack of corporate power to make the contract alleged by defendants. The contract had been fully performed as far as the defendants were concerned. The cattle had been shipped by defendants and accepted by plaintiff's agent at Hollis. If Stine had authority to purchase the cattle, as we think the evidence shows, then no confirmation by Burton was necessary, and the latter's disavowal of any authority on the part of Stine to purchase the cattle, and the failure of the corporation to pay the draft, merely constituted a breach of the contract made between defendants

and plaintiff's agent, and determined plaintiff's liability. It is true that defendants might have brought suit for the value of the cattle and the amount of the expenses incurred in the preparation of the said cattle for shipping, etc., but they elected, at the urgent instance of Burton, to take possession of the cattle, to take care of them, and to find a purchaser therefor at the best possible market price, and by doing so, we think they were not deprived of their right to recover for any loss or damage caused them by plaintiff's breach. Corporations are presumed to contract within their powers. The doctrine of ultra vires, when involved either for or against a corporation, should not prevail, where it would defeat the ends of justice or work a legal wrong, unless the enforcement of the contract be in violation of some express statutory inhibition, or against public policy. Railway Co. v. McCarthy, 96 U. S. 258, 24 L. Ed. 693. Mere general prohibitions against exceeding corporate powers do not make such acts illegal as well as ultra vires. In Bond v. Terrell Mfg. Co., 82 Tex. 309, 18 S. W. 691, it is said:

"It seems now to be settled by the great weight of authority that, where there is a question of contract, * * * [which] has been performed by the other party, and the corporation has received the benefit of the contract, it will not be permitted to plead that on entering into the contract it exceeded its charter powers. Railway v. Gentry, 69 Tex. 632 [8 S. W. 98], and the numerous authorities there cited."

See, also, Steger v. Davis, 8 Tex. Civ. App. 23, 27 S. W. 1068, writ of error denied. Likewise would the corporation be estopped to plead ultra vires if it had led the other party to perform a contract to his injury, loss or damage.

[11] We believe what has hereinbefore been said disposes of the main questions involved in this appeal. While appellant urges that the court erred in denying a new trial on the ground of newly discovered evidence, yet we are of the opinion that the court's action does not disclose an abuse of the large discretion conferred upon a trial court with reference to the refusing or the granting of a new trial on such ground. There was a conflict in the testimony of the defendant Lake and plaintiff's witness Stine as to whether there was one or two conversations had between said Lake and Stine before the shipment of the cattle. Lake remembered only one, while Stine said there were two.

Attached to plaintiff's motion for a new trial was an affidavit of H. L. Puryear, chief adjuster of the telephone company at Ft. Worth, to the effect that subsequent to the trial he had made an investigation of the file record of the telephone company, covering October, 1915, and that such record disclosed that two conversations had been had between Lake and Marrs, one at 8:59 p. m. on October 8th, and the other at 8:19 p. m. on October 10th; that in both instances Lake was the calling party, talking from Ft. Worth to Stine at Chickasha. There was no effort to show what these conversations were about, whether both were with reference to this transaction or not, and, while we are of the opinion that if such evidence had been offered during the trial and the verity of the records had been proven by the operator making them, the same would have been admissible, yet we do not feel that the court's action in overruling the motion, as to this matter, constitutes reversible error.

[12] Appellant makes a further contention that appellees were not entitled to recover in this suit, on the ground of a variance between the allegata and probata. In defendants' cross-action they pleaded that they purchased the cattle included in the shipment as plaintiff's agents. The evidence shows that most of the cattle were purchased before Lake called up Stine, and asked him about shipping them to Hollis. But Lake further testified that when he bought the cattle he had in mind the Hollis Company, and the request made by Burton for said company in the two letters of September 27th and October 5th, to buy for the company said bulls. We cannot see that defendants' right to recover or the measure of the damages would have been different had the petition alleged that the cattle were bought for the Hollis Company by Lake & Marrs, or that they were sold directly to the Hollis Company by defendants. The facts show that the sale was consummated through a commission company as shipper, and that the defendants sold the cattle to the plaintiff at the cost price, plus $10 a car commission and the expense incurred for feed and tipping the horns. We do not think the claim of variance is material.

While we have not attempted to take up the assignments seriatim, yet we believe that we have disposed of the questions of law presented, and all assignments are overruled, and the judgment affirmed.

Affirmed.