375 F.2d 378
 CONTINENTAL ASSURANCE COMPANY, Appellant,
v.
SUPREME CONSTRUCTION CORPORATION, Supreme Developers, Inc. and Mildred Barker, Appellees.
SUPREME CONSTRUCTION CORPORATION, Supreme Developers, Inc. and Mildred Barker, Appellants,
v.
CONTINENTAL ASSURANCE COMPANY, Appellee.
 No. 23615.
 United States Court of Appeals Fifth Circuit.
 March 28, 1967.
 
 COPYRIGHT MATERIAL OMITTED Howard Waldrop, Bun L. Hutchinson, Atchley, Russell, Hutchinson & Waldrop, Texarkana, Tex., for appellant, Victor Hlavinka, Texarkana, Tex., of counsel.
 J. R. Hubbard, William B. Roberts, Harry B. Friedman, Wheeler, Hubbard, Patton & Peek, Texarkana, Tex., for appellees.
 Before WISDOM, COLEMAN and GODBOLD, Circuit Judges.
 GODBOLD, Circuit Judge:
 
 
 1
 This is a suit over whether a $75,000 life insurance policy issued by Continental Assurance Company on the life of Marion O. Barker had lapsed after expiration of the grace period following failure to pay the premium due December 5, 1961.
 
 
 2
 The District Court, sitting without a jury, found the policy was in full force and effect at Barker's death in December, 1963, that Continental had made a loan on the policy but had done so wrongfully, and that without giving effect to the loan the cash value of the policy was sufficient to maintain it in force under the automatic premium loan provision[1] until the death of the insured.
 
 
 3
 The Court held Continental liable to the beneficiaries, Supreme Construction Corporation ("Supreme") and Supreme Developers, Inc. ("Developers") for the face of the policy (with adjustments not here material), less the amount of policy loan necessary to keep the policy in force to the date of Barker's death. It held the death of Barker was not within the accidental death provisions.
 
 
 4
 Supreme and Developers were engaged, respectively, in building houses and acquiring and developing real estate for residential construction.[2]
 
 
 5
 Continental issued two $75,000 policies to Supreme as owner, naming Supreme beneficiary to the extent of two-thirds of the face of each policy and Developers to the extent of one-third. Barker was insured on the policy in suit, Patman on the other. Each policy contained the automatic premium loan provision. All premiums ever paid on the Barker policy were paid by Supreme.
 
 
 6
 In October, 1961, both policies were in full force and effect and no premiums were past due. Barker, writing on the letterhead of a company having no connection with Supreme or Developers and at a different address, wrote Continental asking for a loan application and for information as to the amount of loan available on two other policies of which he was owner and on the policy on his life owned by Supreme. For the latter he was furnished a form[3] with instructions to have it executed on behalf of Supreme, as owner, by an officer other than the insured. The form was completed by Barker in the name of Supreme; Barker either signed or caused someone else to sign Patman's name, as an officer of Supreme other than the insured, and put after it the word "Secretary," all without any authority from Patman. Barker's signature nowhere appeared on the application. Continental compared the purported Patman signature with genuine specimens in its files and approved the loan.
 
 
 7
 Continental disbursed the loan value by a check payable to Supreme, as owner, and delivered to Barker (along with the loan checks on his two individually owned policies). He indorsed the name of the corporation by him, then his own name, and converted the funds to his own use.
 
 
 8
 In December, 1961, premiums on the Barker and Patman policies fell due and were not paid. After the 31-day grace period expired notices were sent to Supreme stating the policies had terminated except for automatic premium loan or non-forfeiture provisions, but agreeing to accept late-paid premiums by a specified date. Patman responded on the Supreme letterhead, requesting loan value be used to pay the premiums on both policies and the beneficiary on each policy be changed to the wife of the insured.
 
 
 9
 Continental wrote Patman there was a full loan on the Barker policy so that the premium loan provision could not operate (and mailed him change of beneficiary forms to be signed by Supreme as owner). This was Patman's first knowledge of a loan on the Barker policy. He discussed it with Barker, who admitted making the loan and using the proceeds. Neither Continental in its letter nor Barker in the discussion told Patman the funds had been secured by a forged signature. (In fact, the Continental letter gave no details of who had made the loan against the policy, or how.)
 
 
 10
 Patman completed the form changing the beneficiary on the policy on his life to Mrs. Patman, having it signed for the corporation by Barker as "officer other than the insured."
 
 
 11
 He wrote Continental, referencing the Barker policy.[4] Continental replied that the Barker policy had lapsed and gave instructions for, and the cost of, "reinstatement," and sent forms for that purpose. Supreme's financial condition did not permit payment of the amount called for to "reinstate;" also the reinstatement application required a statement that Barker was in good health. Barker was not, and Patman knew he was not.
 
 
 12
 Meanwhile Mrs. Barker, from her home, had been corresponding with Continental about lapse and "reinstatement" of the Barker policy. The correspondence implies that Barker expected to pay future premiums. No forms changing the beneficiary to Mrs. Barker were ever completed, and no premiums were paid by Supreme or the Barkers.
 
 
 13
 Neither Patman, Supreme nor Continental took any further action concerning the Barker policy until long after Barker's death. The corporation, of which Barker remained an officer and in which he retained his stock until his death, never took corporate action concerning his procuring the loan, although he had assets. Barker died December 20, 1963. If the policy loan had not been made the loan value would have been more than sufficient, under the automatic loan provision, to carry the policy to his death.
 
 
 14
 In late 1964, attorneys for Supreme raised with Continental for the first time the issue of the policy loan. From copies of documents furnished by Continental, Patman ascertained his purported signature on the loan agreement was a forgery. Proof of death then was filed, first by Mrs. Barker claiming to be the beneficiary, later by Supreme and Developers as beneficiaries. There is in existence a conditional assignment by which Mrs. Barker may receive part of the policy proceeds if collected by Supreme and Developers as beneficiaries.
 
 
 15
 When this tangled skein is unraveled and the threads laid out it is seen that most of the questions involved are factual and, in our opinion, the determinations thereof by the trial court were not clearly erroneous.
 
 
 16
 We agree with the finding that the loan was improperly made by Continental and without authorization from Supreme to Continental to so dispose of the cash value of the policy.
 
 
 17
 There is no plain error by the District Court in its conclusion that Barker had no authority from the corporation to obtain a loan (or to assign the corporation-owned policy as security) and that his action was a fraud on the corporation. There was adequate basis for the Court to conclude there was neither actual nor implied authority emanating from the corporation nor apparent authority arising from Barker's capacity as president and reliance thereon by Continental.
 
 
 18
 Continental itself required the application be signed on behalf of the owner, Supreme, by an officer other than President Barker. The signature delivered to it and honored by it is, even to the untrained eye, obviously not the signature of Patman. Continental acknowledges it is a forgery. And it failed to discover that fact from available data in its own records (or if it ever discovered the forgery did not notify Supreme).
 
 
 19
 Had Continental forthwith discovered the forgery the policy nevertheless would have continued in effect under the automatic premium loan clause.[5] Nevertheless Continental contends that subsequent events relieved it of its contractual obligations.
 
 
 20
 The Court found, and we think it not plainly erroneous, that there was no common law ratification by the corporation of Barker's fraudulent acts. There can be no corporate ratification of acts of an officer "inhibited by the common law as against public policy or * * inhibited by statute."[6] The corporation did not have full knowledge. It did not know the funds had been secured by forgery of the corporate secretary's name.[7] The corporation had received no benefit from the transaction.[8]
 
 
 21
 Continental relies upon the correspondence about "reinstatement" as ratification. Under some circumstances there may be ratification by silence or acquiescence in a situation where there is a duty to speak.[9] This presupposes full knowledge by the principal, which Supreme did not have. The only knowledge of forgery (other than what Barker knew) was in the files of Continental. Also the last correspondence to Continental (see letter of February 19, n. 4, supra) while referring to reinstatement also indicated Supreme desired the policy continued in effect.[10] In the end Continental claims Supreme was not affirmatively as diligent or insistent as it should have been in calling to Continental's attention, and correcting, Continental's errors in relying on the illegal and unauthorized act of a corporate officer and in concluding erroneously that the policy was ineffective unless "reinstated." Continental makes this claim even though after it relied on Patman's forged signature it was notified by Patman himself that he had no knowledge of a loan, and either it did not then check its own files or if it did so failed to recognize or reveal the patent forgery. Continental cannot thus be exonerated of its contractual obligations and Supreme stripped of its contractual rights. Events occurring after forgery may have deepened, or furthered, Continental's slumber, but the detriment to it was delay of pursuit of any rights it may have had against Barker — the policy would have been no less in effect by an earlier discovery of the forgery.
 
 
 22
 After the December premiums were not paid on the two policies Patman and Barker discussed changing the beneficiary on each to the respective insured's wife; the change was made on the Patman policy, not on the Barker policy. There is evidence from which it could be inferred that Patman and Barker, ignoring the thin shell of the corporate entity, had informally divided corporate assets, each securing the legal or equitable ownership of the policy on his life. But these were factual matters for the trial court.[11]
 
 
 23
 The trial court correctly concluded that there was no ratification under Articles 1349 and 1351 of the Vernon's Ann.Revised Civil Statutes of Texas.[12] § 1349, which refers to use of its assets by a corporation for a purpose beyond that authorized by statute or charter, is merely declaratory of the common law confining corporate powers to the limits and purposes for which created. Hollis Cotton Oil, Light and Ice Co. v. Marrs & Lake, 207 S.W. 367, 371 (Ct. Civ.App., 1918). § 1349 refers not to actions within the power of the corporation but beyond the power of the officer who acts. It applies instead to actions beyond the power of the corporation itself. § 1351 is tied to § 1349, and the second paragraph of § 1351, relating to failure to repudiate the wrong and discharge those responsible, does not operate to bind the corporation for acts of an officer within the power of the corporation but beyond the authority of the specific officer involved.
 
 
 24
 Whether § 1351 may be invoked by a private litigant or only by governmental authorities to effect a forfeiture of the charter is an issue best decided by the state courts of Texas.
 
 
 25
 The Court applied the correct measure of damages. An insured whose policy is wrongfully cancelled may acquiesce in the cancellation and sue for damages, calculated as the value of the policy at the date of cancellation; the measure is the face value of the policy less interest according to the insured's life expectancy and less the premiums required to keep the policy in effect during the insured life expectancy. E. g., National Life & Accident Ins. Co., Inc. v. Johnson, 154 S.W.2d 219 (Ct.Civil App., 1941), writ of error dismissed. Or the insured may refuse to acquiesce in the wrongful cancellation and tender premiums as they mature. Supreme Lodge Knights of Pythias v. Neeley, 135 S.W. 1046 (Ct.Civil App., 1911); National Life Co. v. Rice, 140 Tex. 315, 167 S.W. 2d 1021 (Comm.Civil App., 1943) writ of mandamus denied; National Life Co. v. Harvey, 159 S.W.2d 920 (Ct.Civil App., 1942). If the insured chooses this alternative, upon his death the beneficiary may recover the face of the policy less any premiums due before the death of the insured. Universal Life & Accident Ins. Co. v. Nanes, 92 S.W.2d 473 (Ct. Civil App., 1936). The same principle applies here. Supreme, the owner, was found by the trial court not to have acquiesced. It notified Continental it desired the policy remain in effect and the loan value used to pay premiums.
 
 
 26
 The question of accidental death was factual. We have carefully reviewed the evidence and see no purpose in restating it here. The finding of the District Court that the beneficiaries had not established accidental death as defined by the policy is not plainly erroneous.
 
 
 27
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 "The amount of any premium falling due at any time after a cash value is available under this policy, if not paid within the grace period, will be advanced by the Company as a loan on this policy, bearing interest at the rate and under the conditions prescribed for policy loans, provided the cash value at the next premium due date, less any indebtedness secured by this policy, is equal to or greater than such premium with interest thereon to the end of such premium period. If the net cash value is less than the amount necessary to provide a loan of such premium with interest thereon to the end of the premium period, the Company will advance as a loan such maximum fractional part of such premium as the net cash value, at the end of the period covered by such fractional premium, will allow; and, if prior to the expiration of such fractional period, the last due premium be not fully paid, all liability of the Company under the policy shall terminate at the end of such fractional period, subject, however, to the notice provided in the policy provision relating to policy loans. While this policy is sustained in force through the medium of premium loans, the payment of premiums may be resumed without evidence of insurability, and the accumulated loans may be paid off at any time prior to default in payment of premium. These automatic premium loans shall bear interest at the rate prescribed for policy loans from the dates the respective premiums loaned were due; and shall constitute an indebtedness against the policy in priority to the claim of any assignee or any other person. The word "premium" as used in this provision means the entire premium under the policy, including the premium for all benefits provided by any rider or supplementary contract forming a part of this policy
 "This Provision may be terminated at any time by the Owner prior to default in payment of premium upon written notice to the Company at its Home Office, but such termination shall not affect any loan previously made hereunder."
 "Nothing in this Rider contained shall be construed to alter, vary or change any of the terms, conditions or provisions of said policy other than as stated above."
 
 
 [2]
 Supreme was owned 50% by Connor W. Patman and wife and 50% by the insured Barker and wife; Developers, 51% by Patman and wife and 49% by Barker and wife. Barker was President of Supreme and Patman the Secretary from 1954 until April, 1962, when Patman became President, his wife Secretary, and Barker Vice-President. Patman and Barker were officers of Developers also. Patman was an attorney and in 1962 had been for about 15 years
 
 
 [3]
 The form was both a policy loan application and an agreement to repay. It provided that the policy was assigned to Continental as security for the loan
 
 
 [4]
 "I received your letter of February 15, 1962, and was very surprised to learn that a loan had been made upon the policy as I had no knowledge of its application and did not find the request for the loan. The corporation is still the owner of the policy, and it is desired that the policy continue in force and effect. I would like for you to advise me as to the cost in order to reinstate this policy by the payment of a quarterly premium. It is desired that the policy continue in force and effect with the corporation as the owner at the present time as Mr. Barker and I will probably later change the beneficiaries and ourselves as the owners, but at the present time it is desired that ownership continue in the corporation."
 
 
 [5]
 As discussed infra, one of Supreme's options following wrongful disavowal of the policy by Continental would be to tender premiums so as to keep the policy in effect, and upon death of the insured the beneficiary could sue for the face of the policy. The automatic premium loan provision would have this effect even without notice from insured, beneficiary or owner (hence the term "automatic")
 
 
 [6]
 Pruitt v. Westbrook, 11 S.W.2d 562 (Ct. Civil App., 1928); Dunagan v. Bushey, 257 S.W.2d 822, 825 Ct.Civil App.), aff'd in part, rev'd in part, 152 Tex. 630, 263 S.W.2d 148 (1953)
 
 
 [7]
 Clubb Testing Service, Inc. v. Singletary, 395 S.W.2d 956, 959 (Ct.Civil App., 1965); Almar-York Company v. Fort Worth National Bank, 374 S.W.2d 940 (Ct.Civil App., 1964), writ of error refused; Brooks v. Zorn, 24 S.W.2d 742 (Ct.Civil App., 1930); Hurlbut v. Gainor, 45 Tex. Civ.App. 588, 103 S.W. 409 (1907); 14 Tex.Jur.2d, Corporations § 345
 
 
 [8]
 Texas Conservative Oil Co. v. Jolly, 149 S.W.2d 265 (Ct.Civil App., 1941); Williford Lumber Co. v. Malakoff Brick Co., 113 S.W.2d 248 (Ct.Civil App., 1938) appeal dismissed; Lyons v. Texorado Oil and Gas Co., 91 S.W.2d 375 (Ct.Civil App., 1935), writ of error refused
 
 
 [9]
 Almar-York Co. v. Fort Worth National Bank, supra; Knowles v. Northern Texas Traction Co., 121 S.W. 232, 240-241 (Ct.Civil App., 1909)
 
 
 [10]
 The Court, considering the letter and the oral testimony, found Supreme did not intend to ratify
 
 
 [11]
 See the letter of February 19, n. 4, supra, written after many of the events that tend to indicate change in ownership
 
 
 [12]
 "Art. 1349. Acts prohibited. No corporation, domestic or foreign, doing business in this State, shall employ or use its stock, means, assets or other property, directly or indirectly for any purpose whatever other than to accomplish the legitimate business of its creation, or those purposes otherwise permitted by law; provided that nothing in this Article shall be held to inhibit corporations from contributing to any bona fide association, incorporated or unincorporated, organized for purely religious, charitable or eleemosynary activities, or to commercial or industrial clubs or associations or other civic enterprises or organizations not in any manner nor to any extent directly or indirectly engaged in furthering the cause of any political party, or aiding in the election or defeat of any candidate for office, or aiding in defraying the expenses of any candidate for office, or defraying or aiding in defraying the expenses of any political campaign, or political headquarters, or aiding or assisting the success or defeat of any question to be voted upon by the qualified voters of this State or any subdivision thereof."
 "Art. 1351. Penalty. Any corporation which shall violate any provision of Article 1348 or Article 1349, Revised Civil Statutes of Texas, 1925, shall on proof thereof in any Court of competent jurisdiction, forfeit its charter, permit or license, and all rights and franchises which it holds under, from or by virture of the laws of this State.
 "Whenever it appears that the money, assets, property, or funds of a corporation have been issued, paid out, or used, in violation of any provision of said Articles 1348 or 1349, by any agent, attorney, director or officer of such corporation, it shall be considered the act of the corporation, unless, within one year from the date of such violation it has caused to be entered, through its board of directors on its records in this State, an order repudiating the wrong and permanently dismissing from its service all persons directly or indirectly connected with such violations."